Ruffin, Chief Justice.
 

 Robert P. Tredway purchased the premises in controversy from one Bailey, and took a conveyance in fee, on the
 
 25th
 
 of September, 1835; and both of the parties to this suit claim under Tredway. The price he was to give Bailey was $1000; of which $500 was secured by Tredway’s own bond, and the other $500 by the bond of Tredway and the defendant, Ray, as his surety. At the time Ray executed the bonds, it was understood between those three persons, that Ray was to be indemnified
 
 *341
 
 from Joss by a conveyance of the land as a counter-security; and he and Tredway requested Bailey to make his convey-" anee directly to Ray, instead of Tredway. But Bailey dedined doing so, and Ray, who was father-in-law of Tredway, then became surety, upon an agreement of Tredway to secure him by a mortgage of the land.
 

 On the 28th of September, 1835, Ray took from Tredway conveyances for the lands purchased from Bailey, and also for all his other property, real and personal; all which were absolute and unconditional in their terms, but were really given upon an agreement between the parties, that they should operate as a counter-security to Ray, in the manner above mentioned. In March, 1836, Halcombe, the lessor of the plaintiff, and one Love and other creditors, brought actions against Tredway; and he, in April following, having remained in possession of all the property he had conveyed to Ray, and being still indebted to those persons, and also to Bailey for the land and to others, made a contract to sell to Ray all his remaining interest or right of redemption in the laud, and removed from the State. All those debts existed at or before the execution of the deed to Ray of the 28th of September, 1835, unless it might be the debt to the lessor of the plaintiff; and it did not appear whether that was contracted before or after that day. The land is of the value of $1000; and after Tredway left this State, the defendant paid $400, in part of the debt to Bailey, for which he was surety; and there remains due thereon $100, for which he is still liable. He also paid the further sum of $500 to Love and other creditors of Tredway, and assumed to pay $200 more for him. In June, 1836, judgment was recovered in the action brought by Halcombe against Tredway, and urn der a
 
 fieri facias
 
 thereon the land was sold and purchased by the lessor of the plaintiff.
 

 On the trial, the counsel for the defendant moved the court to instruct the jury that the conveyance to the defendant was good, and vested the land in the defendant, although it was absolute in form, and although it was intended if should only be a security in the nature of a mortgage, to indemnify the defendant from loss as Tredway’s security, pro?
 
 *342
 
 vided the deed, in the opinion of the jury, was executed with ^13
 
 bona fide
 
 purpose that it should be used or operate only as such counter-security, and with no actual intent to deceive and hinder Tredway's creditors. And the counsel moved for the-further instruction, that, if the foregoing proposition were not true in respect to Tredvvay’s creditors, whose debts existed' at the time he conveyed to Ray, yet it was, at least, true in respect to the debt to the lessor of the plaintiff, who did not shew when he became a creditor. And the counsel for the defendant moved the court further to instruct the jury that the purchase, by the defendant in April, 1836, of the remaining or absolute interest of Tredway, confirmed and made effectual the deed of September, 1835, as an absolute conveyance, although intended, at first, only as a mortgage; especially, if the Jury should believe there was a re-delivery thereof in April, 1836.
 

 Upon those several points his Honor gave his opinion: that the deed, being absolute, but intended at the time as a mortgage, was void as against Tred way’s creditors; and that the lessor of the plaintiff was such a creditor as could avail himself thereof; and that the subsequent purchase by the defendant could not give effect to the prior deed, unless it was, upon such purchase, re-délivered; in which case, the title would pass from the re-delivery.
 

 There was a verdict and judgment for the plaintiff, and the defendant.appealed.
 

 The first part of the instructions is, doubtless, founded on the case of
 
 Gregory
 
 vs.
 
 Perkins,
 
 4 Dev. Rep. 50, and is supported by that descision. The taking absolute conveyances, where only a mortgage was intended and where the possession remains unchanged, has ever been regarded as a strong badge or circumstance of fraud at common law or under the statute 13 Eliz. But, independant of that consideration, we thought the rule, laid down in
 
 Gregory
 
 vs.
 
 Perkins,
 
 the necessary consequence of the recent acts of the General Assembly, denying any operation to mortgages and deeds of trust until they are registered, and declaring them void, as against creditors and purchasers, unless registered
 
 *343
 
 within a prescribed time. There may be, in many cases, difficulties in ascertaining, as a matter of fact, the true nature of the transaction intended by the parties and in coming to the conclusion, whether a mortgage or mere security in the nature of it was designed. But in this ease there is no doubt upon that point; as the real character of this transaction is manifest, and, indeed,, is admitted in the instruction as prayed. To sustain an absolute deed, thus acknowledged to have been intended by the parties to be only a mortgage, would, in truth, be to defeat the policy of the Legislature and make the acts- of 1820 and 1829 a dead letter. But, it is said, the parties may have put their contract into this form ignorantly and, therefore,, innocently; and that thereof the Jury should enquire. Not so. For the same' thing may be said in regard to the omission to register a mortgage, appearing on its face to be a mortgage. — .That may also arise from want of knowledge and not from a purpose actually deceptive and fraudulent. Yet the effect to a creditor or purchaser is the same: He is deceived, and, therefore, the statute is. express and positive, that, at all events, the unregistered mortgage shall be void. By a necessary construction, the law must mean the same thing in regard to- an absolute deed, inten ded to be only a mortgage;- since, altho’ registered, it imparts to creditors and purchasers no more' knowledge of the truth and of their rights, than they would derive from a deed, in its terms a mortgage, which the party keeps in his pocket unregistered. If the deed-had truly expressed'the contract of the parties, the mortgagor’s creditors would have a plain legal remedy against his equity of redemption in lands, and in equity against that in chattels;- and the Legislature, by the acts under consideration, intended to provide for the creditors such means of knowledge as would enable them to avail themselves promptly and cheaply of those remedies. Our duty is to receive and administer the-statutes in a sense, which will advance the remedies and secure to creditors the whole benefit intended for them; and, therefore, we are obliged to hold such a deed void, because it obstructs and baffles the creditor in the pursuit of his debts by those remedies the law intended to afford him; and, if allowed to stand,
 
 *344
 
 the creditor would be in the same condition as if no such ^aW eVer Passe<^-
 

 We also think the lessor of the Plaintiff is a creditor within the acts, tho’ he may have becomesoaftcrtheexecution of the deed to the defendant. His debt certainly arose as early as March 1836; and, therefore, existed before the second contract between Tredway and Ray and while the former had an equity of redemption in the premises. As respects this question, that second contract makes no difference. If valid it would defeat this creditor, and also all others, tho’their debts existed before September 1835, unless ripened into judgment and execution, so as to create a lien before the final and absolute sale. But supposing the second contract not to be effectual in itself, or in confirmation of the deeds before made, then, we think, the lessor of the plaintiff may impeach the deed upon the ground he does; because if the deed had been a mortgage in terms, hecould, under the act of 1812, have sold the equity of redemption existing in the mortgagor at the time he recovered his judgment.
 

 The deed can derive no' aid from the subsequent transactions of April, 1836. In the first place, if it had been in fact re-delivered, there are authorities, that the deed is not made good thereby; because it was good between the parties, and, so had taken some effect from the first delivery, and, therefore, could not be surrendered, to be delivered a second time. In the next place, that question ought not to have been left to the jury; for there was no evidence whatever on the point. But no stress is laid upon either of those matters, since the'jury has found, that there was not n second delivery. Then, the case stands merely on the second contract and the payments made by the defendant under it; and it has been contended, that the deed, tho’ originally fraudulent and void, is rendered valid by this
 
 ex post facto
 
 purchase at a fair price. It is not denied, that conveyances may become good, to some purposes, by matter
 
 ex post facto.
 
 If a father give land to- his son, and the latter, being about to marry, settle it on the intended wife and the issue; or if¡a fraudulent vendee sell to a
 
 bona fide
 
 purchaser, the creditors of the first grantor are bound, because the wife and the
 
 *345
 
 other purchaser are persons protected by the statute.
 
 Martin
 
 vs.
 
 Cowles,
 
 1 Dev. and Bat. 29. But a fraudulent tee can by no subsequent matter confirm the deed or purge it of its vice, so as to render it effectual as a conveyance to vest a title in himself. He can only become the owner of the property by a new and independent contract and conveyance.
 

 Per Curiam. Judgment affirmed.